UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>GINA MCCARTHY,<br><br>　　　　Defendant. | Case No. 15-cv-01165-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 27 & 35 |

Before the Court are the cross-motions for summary judgment filed by Plaintiffs Sierra Club and California Communities Against Toxics ("Plaintiffs") and Defendant Gina McCarthy ("Defendant"), in her official capacity as Administrator of the Environmental Protection Agency ("EPA"). Dkt. Nos. 27 ("Mot.") & 35 ("Opp."). Plaintiffs and Defendant agree that there is no dispute the EPA has failed to fulfill certain mandatory rulemaking duties under the Clean Air Act, 42 U.S.C. §§ 7604(a), 7412(d)(6), and 7412(f)(2). The only question before the Court is how long the EPA should be given to comply with its statutory obligations.

The Court has carefully considered the parties' arguments, both in their papers and at oral argument. For the reasons set forth below, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and enters judgment in favor of Plaintiffs. The terms of the judgment are set forth below. Plaintiffs may file any appropriate motion for attorneys' fees and costs within 30 days.

### I. BACKGROUND

#### A. Statutory Framework

The purpose of the Clean Air Act, codified at 42 U.S.C. §§ 7401, *et seq.* ("CAA"), is "to

protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). Section 7412 of the CAA[1] regulates hazardous air pollutants. Hazardous air pollutants are defined as "any air pollutant listed" in the statute. *Id.* § 7412(a)(6). In 1990, Congress listed by statute 189 air pollutants as hazardous. *Id.* § 7412(b)(1).

The EPA was then required to publish an initial list of all categories of "major" and "area" sources of hazardous air pollutants within one year. *Id.* § 7412(c)(1). A major source is defined as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit" a certain level of hazardous air pollutants in one year. *Id.* § 7412(a)(1). A stationary source includes "any building, structure, facility, or installation which emits or may emit any air pollutant." *Id.* § 7411(a)(3); *see also id.* § 7412(a)(3) (incorporating the definition set forth in § 7411). An area source means "any stationary source of hazardous air pollutants that is not a major source." *Id.* § 7412(a)(2).

For each source category listed, the EPA must promulgate an emission standard requiring the "maximum degree of reduction" achievable using "maximum achievable control technology." *Id.* § 7412(d)(1)-(2). These emission standards vary depending on whether the source category is a new or existing source: for new sources, they must be at least as stringent as what the best single performing source has achieved in practice; for existing sources, they must be at least as stringent as what the relevant group of best-performing sources have achieved. *Id.* § 7412(d)(3). Congress gave the EPA two years to promulgate these standards for the first 40 source categories and until 2000 to issue the rest. *Id* § 7412(e)(1). Since then, when a new source category is listed, the EPA must promulgate emission standards within two years. *Id.* §§ 7412(c)(3), (c)(5), (c)(6).

The EPA must also review its promulgated emission standards in light of developments in practices, processes, and control technologies at least every eight years. *Id.* § 7412(d)(6). The agency must then either promulgate a revised emissions standard or issue a final determination not to revise the existing standard based on a published finding that revision is not necessary to ensure compliance with § 7412(d). *Id.* And, regardless of this technology-based review, the EPA must

---

[1] All uses of the term "Section" hereinafter refer to the CAA, unless otherwise noted.

also evaluate "the risk to the public health remaining" and make a legislative recommendation to Congress if necessary. *Id.* § 7412(f)(1). If Congress fails to act on any such recommendation, the EPA is required to promulgate revised emissions standards sufficient to provide at least "an ample margin of safety to protect public health" within eight years of the last standard. *Id.* § 7412(f)(2).

Whenever § 7412(d) and § 7412(f) require the EPA to issue a new or revised emissions standard or make a determination, the agency must also provide public notice, publish information about the proposed rule, and consider and address public comments received before issuing a final rule or determination. *See id.* §§ 7607(d)(1), (d)(5), (h).

### B.  Reviewing Emissions Standards for Pulp Mills and Yeast Manufacturers

The facts of this case are not in dispute. On July 16, 1992, the EPA listed pulp mills (used in the process of paper manufacturing) and nutritional yeast manufacturers as major sources of hazardous air pollutants in its initial source category list promulgated under § 7412(c)(1). 57 Fed. Reg. 31,576, 31,592, tbl. 1 (Jul. 16, 1992). The EPA promulgated emissions standards under § 7412(d)(1) for both of these major source categories in 2001. 40 C.F.R. §§ 63.2130-.2192 (yeast manufacturers), 63.860-.868 (pulp mills). But, for each of these emissions standards, the EPA has not yet performed the required § 7412(d)(6) technology-based reassessment. Compl. ¶¶ 28, 33; Dkt. No. 22 ("Ans.") ¶¶ 28. And, despite congressional inaction, the EPA has also not yet determined whether there are residual risks to the public health from these source categories that warrant the promulgation of revised emissions standards. Compl. ¶¶ 17, 28, 33; Ans. ¶¶ 28, 33.

Plaintiffs filed this lawsuit on March 12, 2015, under the CAA's citizen suit provision to require the EPA to perform its rulemaking obligations. Compl. ¶ 2 (citing 42 U.S.C. § 7604(a)); Ans. ¶ 3.[2] To that end, Plaintiffs seek a declaratory judgment stating that the EPA has failed to comply with its statutory obligations under § 7412(d)(6) and § 7412(f)(2) with respect to the pulp mill and nutritional yeast manufacturing source categories and injunctive relief mandating that the EPA either promulgate revised emissions standards for those source categories or issue a final

---

[2] Plaintiffs have associational standing to bring this suit because the performance of the EPA rulemakings could protect certain of their members' health, recreational, and aesthetic interests. *See* Dkt. Nos. 27-4 to 27-12 (Plaintiffs' member declarations); *see also Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (associational standing requirements).

determination that such standards are not required. Compl. ¶ 72. Plaintiffs also seek an award of attorneys' fees and costs. *Id.*

## II.      LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

The parties agree that this case is properly resolved on their cross-motions for summary judgment. Mot. at 11-12; Opp. at 4. When there is no dispute that an agency has failed to timely fulfill a rulemaking obligation, summary judgment is the appropriate mechanism to determine when compliance is due. *See, e.g.*, *Sierra Club v. McCarthy*, No. 14-cv-5091, 2015 WL 3666419, at *3 (N.D. Cal. May 7, 2015) (determining deadline for the EPA to comply with its unfulfilled mandatory duties under the CAA at summary judgment). In those situations, courts generally have broad equitable discretion to fix an appropriate deadline. *See Nat. Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 999-1000 (9th Cir. 2000). That said, if Congress found that a certain amount of time was appropriate for the agency to complete its statutory duty in the first instance, that timeframe should generally still control. *Sierra Club v. Thomas*, 658 F. Supp. 165, 171 (N.D. Cal. 1987).

But courts should not demand a deadline for agency compliance that is impossible or infeasible. *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) ("The sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls for him to do an impossibility.") (internal quotation omitted). To determine whether a deadline is infeasible, the Court should consider: (1) whether the "budgetary" and "manpower demands" required are "beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs"; and (2) an agency's need to have more time to sufficiently evaluate complex technical issues. *Id.* at 712-13. A delinquent agency bears a "heavy burden" of showing infeasibility. *Thomas*, 658 F. Supp. at 171.

## III. DISCUSSION

The EPA admits that it has failed to meet its statutory obligations under the CAA to review and, if necessary, revise its emissions standards for the pulp mill and yeast manufacturing source categories under § 7412(d)(6) and § 7412(f)(2). For that reason, the Court enters the declaratory judgment of liability requested by Plaintiffs. *See* Compl. ¶¶ 72(1), (3). The only question is what timetable should be imposed on the EPA for it to complete its reviews and, if necessary, revise the standards at issue. The parties have each submitted proposed timetables. The Court finds that a schedule hewing closer to Plaintiffs' proposal is appropriate in light of Congress's guidance.

The EPA submits two sets of proposed timetables to review and potentially revise its emissions standards for pulp mills and yeast manufacturers. With respect to pulp mills, the EPA requests 21 months to complete its review and issue a proposed action and 35 months to complete its final action. Opp. at 2. With respect to yeast manufacturers, the EPA requests 27 months to complete its review and issue a proposed action and 40 months to complete its final action. *Id.* Plaintiffs contend that the EPA can and should be required to complete its reviews within one year, the time in which Plaintiffs represent the EPA is statutorily required to act. Mot. at 14.

In support of its timetables, the EPA submits the Declaration of Janet G. McCabe, the Acting Assistant Administrator for the Office of Air and Radiation at the EPA. Dkt. No. 35-1 ("McCabe Decl.") ¶ 2. Ms. McCabe explains that there are nine phases to the instant rulemaking process: (1) project kickoff; (2) preliminary information collection; (3) supplemental information collection; (4) data analysis and modeling; (5) residual risk analysis and technology review; (6) development of the rule proposal package; (7) proposed rule publication and comment period; (8) comment analysis; and (9) development of the final rule package. *Id.* ¶ 10. Ms. McCabe provides a summary of the tasks necessary to complete each phase as well as an estimate of how long she estimates the EPA will need to complete those tasks for each emissions standard at issue. Each estimate represents the "minimum reasonable time" to complete the phase; anything less "could jeopardize both the soundness of the regulatory actions and their legal defensibility and/or be forced to delay other [standards reviews] of higher priority to the [EPA]." *Id.* ¶ 7.

Plaintiffs raise two threshold issues about the McCabe Declaration that require discussion

1  before turning to the substance of the EPA's timetables.  First, Plaintiffs argue that the timetables
2  set forth by the EPA should be disregarded because Ms. McCabe considers only a "reasonable"
3  timeframe to come into compliance with the CAA, not what is feasible or possible.  Reply at 11-
4  12.  Plaintiffs are correct that when the EPA has failed to review and revise emissions standards
5  after years of inaction, the agency bears a heavy burden in arguing that it is infeasible to comply
6  with any congressionally-mandated timetable.  But that begs the question of what, if any,
7  timetable the CAA sets forth for the EPA to complete a review and revision of a source category
8  under § 7412(d)(6) and § 7412(f)(2).  *See Thomas*, 658 F. Supp. at 171-72.

        Plaintiffs represent that the CAA provides the EPA with one year to complete these kinds of technology- and health-based reviews and any necessary revisions.  They reason that because § 7412(c)(1) required the EPA to publish an initial list of major source categories of hazardous air pollutants within one year of the 1990 amendments to the CAA, the same deadline controls any revisions of emissions standards for listed categories.  The Court disagrees.  While § 7412(c)(1) gave the EPA one year to issue its initial list of major source categories, § 7412(e)(1)(A) provided the agency two years to promulgate an emissions standard for 40 source categories on the initial list.  Similarly, a two-year deadline now controls the timeframe for the promulgation of emissions standards for any source categories added to the list.  42 U.S.C. § 7412(c)(5).  Because Congress clearly provided the EPA with two years to create emissions standards under both the initial and revised source category lists, the Court finds that timeframe is appropriate here.  The EPA bears the heavy burden of showing that it is infeasible to become compliant within two years.  To that effect, the EPA itself states that, "the minimum timeframe needed for completing [this type of] project is . . . 2 years from project kickoff."  McCabe Decl. ¶ 31.

        The Court must next determine when the deadline started counting down.  Plaintiffs do not address this issue head on in their briefs.  The EPA argues that the clock started on October 1, 2015, *id.* ¶ 11, the date when this matter was deemed submitted, *see* Dkt. No. 40. Plaintiffs believe that the EPA must show that it was impossible to start any earlier and, in any case, they point out that the EPA already started the requested rulemaking processes by that date, as Ms. McCabe admits.  Reply at 9.  While Plaintiffs are correct that the EPA has already started performing some

6

of its rulemaking functions, a fact which is discussed below in the context of the EPA's estimates, the Court believes that the submission date is the appropriate start date. Accordingly, the presumptive compliance deadline is October 1, 2017, for both reviews for both source categories. The Court will address whether the EPA has met its burden of showing that it is infeasible or impossible for it to complete the requested rulemakings by that date below.

Before turning to that issue, the Court must address Plaintiffs' second threshold argument. Plaintiffs point out that Ms. McCabe's estimates take into account "other obligations" her office within the EPA must meet within the same timeframe. *Id.* These other obligations include 21 other identical reviews that must be performed for different source categories. *Id.* She does not say how long the instant reviews would take independent of other considerations. *Id.* Plaintiffs argue that the consideration of other projects should disqualify the EPA's requested timetable because the agency must show that it cannot complete the requested rulemakings by the deadline standing alone. The Court disagrees. Courts routinely consider whether the "budgetary" and "manpower demands" required for compliance are "beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs[.]" *See Train*, 510 F.2d 692 at 712-13. There is nothing about that standard that suggests the Court must consider how long the EPA could complete the requested rulemakings in isolation. For that reason, the Court does not disqualify the EPA's estimates because they take into account other rulemakings that it is required to perform. That said, the Court will not find that compliance with the two-year deadline is infeasible merely because the EPA has other deadlines to meet.

With those preliminary issues decided, the Court now turns to the substance of the EPA's proposed timetables for compliance. The Court takes the EPA's representations about the phases that comprise a review and possible revision under § 7412(d)(6) and § 7412(f)(2) at face value and proceeds to analyze its proposed timetables on a phase-by-phase basis. For the reasons set forth below, the Court finds that the EPA has not met its burden of showing it would be infeasible to complete the requested rulemakings on or before October 1, 2017. And although it has authority to "set enforceable deadlines both of an ultimate and an intermediate nature," *see Train*, 510 F.2d at 705, the Court exercises its equitable discretion and declines to set any intermediate deadlines

here.

The Court considers the first three phases in tandem because they are interrelated. In the project kickoff phase, the EPA identifies the stakeholders and holds meetings to explain the rule development process and to seek information. *Id.* ¶¶ 12, 22. The EPA estimates that this phase will take approximately two months for each source category. *Id.* For the preliminary information collection phase, the EPA collects background literature, information about the effectiveness of current standards and technological developments, and gathers data to determine if additional information collection is needed. *Id.* ¶¶ 13, 23. The EPA estimates that this phase will take three months for yeast manufacturers, but represents that the process has already been completed for pulp mills. *Id.* The next phase, supplemental information collection, is "optional." *Id.* ¶¶ 14, 24. The EPA "currently believe[s]" that detailed information collection will be required for the yeast manufacturing category, although it does not say why, and will likely take seven months. *Id.* ¶ 14. For pulp mills, the supplemental information collection phase has also been completed. *Id.* ¶ 24.

Given that the preliminary and supplemental information collection phases have already been completed for pulp mills, the Court does not credit the EPA's request for two months to complete its preceding kickoff phase. Under the circumstances, the Court will not afford any time to complete the first three phases of the pulp mill review process. With respect to yeast manufacturers, the Court believes that two months for the project kickoff phase is excessive. The EPA notes that it has already identified the five major sources of yeast manufacturing, which undercuts the need to spend time the full time identifying potential stakeholders. *See id.* ¶¶ 12, 14. For the same reason, three months is excessive for the initial information collection phase, which also allocates time to identify the current inventory of facilities in the source category. *See id.* ¶ 13. The EPA's representations about supplemental information collection also are not persuasive. Apart from the fact that the phase is admittedly optional, the lack of any explanation as to why it might be necessary in this instance is insufficient to warrant the allocation of any time to its completion. Accordingly, the Court finds that the EPA could complete the first three phases of its review for yeast manufacturing within three months.

The fourth phase involves developing a detailed modeling file of the emissions that occur

8

1    under each source category. *Id.* ¶¶ 15, 25. Extensive quality assurance measures accompany its

2    creation. *Id.* The EPA represents that it will take two months to complete a modeling file for

3    yeast manufacturing, which would be relatively straightforward, and one month to perform quality

4    assurance on the more complicated, but already completed, modeling file for pulp mills. *Id.*

5    Plaintiffs do not directly challenge these time estimates. The Court finds them reasonable.

6          The fifth phase consists of a residual risk analysis and a technology review. *Id.* ¶¶ 16, 26.

7    In this phase, the EPA conducts various assessments of health risks that flow from the outputs

8    generated by the modeling file. *Id.* An inhalation risk assessment is always performed and the

9    time necessary to complete that assessment varies with the size of the category. *Id.* ¶¶ 16(a),

10   26(a). The EPA estimates that one month is needed to complete an inhalation assessment for yeast

11   manufacturers and three months for the larger category of pulp mills. *Id.* A multipathway

12   screening assessment is performed only where the hazardous air pollutants at issue are "persistent

13   and bioaccumulative." *Id.* ¶¶ 16(b), 26(b). Yeast manufacturers do not present that type of risk,

14   so no time is included in the EPA's timetable. *Id.* ¶ 16(b). But the EPA notes that "preliminary

15   information suggest" that a multipathway assessment "may be needed" for pulp mills. *Id.* ¶ 26(b).

16   Plaintiffs agree that mercury, a chemical that triggers a multipathway screening assessment, *id.* ¶

17   26(b), is released from pulp mills, Mot. at 6. The EPA estimates that it would take three months to

18   complete an initial multipathway assessment, *id.*, and an additional four months would be needed

19   in the event that a particular source facility failed the initial assessment, *id.* ¶ 26(c). Given that

20   there is no way to determine in advance whether a facility would fail, the Court cannot say that it

21   would be infeasible for the EPA to complete its multipathway assessment without this testing. An

22   additional one week "risk-based demographic assessment" may also be necessary after completion

23   of the inhalation assessment, but it can be done concurrently with any multipathway assessment.

24   *Id.* ¶¶ 16(d), 26(d). Accordingly, the Court finds that the EPA could complete the fifth phase for

25   yeast manufacturers in five weeks and for pulp manufacturers in six months.

26         In the sixth phase, the EPA develops the rule proposal packages, which requires internal

27   briefing and the drafting of technical memoranda and the regulatory package. *Id.* ¶¶ 17, 27. The

28   EPA believes that this will take eleven months for yeast manufacturers and eight months for pulp

mills, not including tasks that can be performed concurrently with the previous phases. *Id.* Plaintiffs do not contest that these estimates are appropriate. Accordingly, the Court applies them.

The remaining three phases consist of public commentary, revisions, and publication of the final rules. In the seventh phase, the EPA publishes the proposed rules and holds open a minimum one month public comment period. *Id.* ¶¶ 18, 28. It takes at least two weeks for publication. *Id.* But the EPA requests three months to accommodate potential delays in publication and to hold a longer comment period. *Id.* In the eighth phase, the EPA summarizes public comments and drafts responses. *Id.* ¶¶ 19, 29. The agency estimates that this phase will take three months for both source categories. *Id.* And in the ninth and final phase, the EPA develops the final rule package. *Id.* ¶¶ 20, 30. To do so, the agency prepares internal briefing on the public comments it has received, revises the rule package and supporting documentation, reviews the updated materials, and completes and submits the final package for publication. *Id.* The EPA estimates that this will take six months for yeast manufacturing and eight months for pulp mills. *Id.*

In sum, the EPA estimates that the last three phases will take 12 months to complete for yeast manufacturing and 14 months for pulp mills. Plaintiffs respond that these estimates vastly understate what is feasible in light of the fact that three recent reviews under § 7412(d)(6) and § 7412(f)(2) took between five and seven months. *See* 73 Fed. Reg. 29,184, 29,281 (May 20, 2008) (proposed rule for lead); 73 Fed. Reg. 66,964, 67,051 (Nov. 12, 2008) (final rule signed Oct. 15, 2008); 74 Fed. Reg. 64,810, 64,869 (Dec. 8, 2009) (proposed rule for sulfur dioxide); 75 Fed. Reg. 35,520, 35,592 (Jun. 22, 2010) (final rule signed Jun. 2, 2010); 74 Fed. Reg. 34,404, 34,459 (Jul. 15, 2009) (proposed rule for nitrogen oxides); 75 Fed. Reg. 6474, 6531 (Feb. 9, 2010) (final rule signed Jan. 22, 2010). The EPA has not sufficiently explained why there is a difference between the instant rulemakings and these recent examples. Accordingly, the Court finds that it is feasible to complete phases seven through nine for both source categories within five to seven months.

The Court finds, based on its review of the EPA's estimates, that it would be feasible for the agency to perform its rulemaking obligations with respect to yeast manufacturers within 24 months and with respect to pulp mills within 22 months. For that reason, the Court finds that the EPA has failed to meet its burden of showing that it is infeasible to comply with the presumptive

1    two-year compliance deadline to promulgate revised emissions standards for yeast manufacturers
2    and pulp mills under § 7412(d)(6) and § 7412(f)(2).  This finding is bolstered by the fact that the
3    EPA completed the entire rulemaking process for oil and natural gas production, which included
4    between 269 and 990 sources, in 30.8 months.  *See* 76 Fed. Reg. 52,738, 52,767 (Aug. 23, 2011)
5    (source count for oil and natural gas); McCabe Decl., Att. A (representing that the entire oil and
6    natural gas rulemaking process took 30.8 months).  In this case, there are only five total sources
7    for yeast manufacturers and slightly over 100 pulp mills.  Compl. ¶ 31; Ans. ¶ 31; Opp. at 7; Reply
8    at 13.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and enters judgment in favor of Plaintiffs.  The terms of the judgment are as follows:

(1)    The Court **DECLARES** that Defendant, in her official capacity as Administrator of the EPA, has failed to perform rulemakings and take mandatory action fulfilling her non-discretionary duties under 42 U.S.C. § 7412(d)(6) to review and either to revise or to issue a final determination not to revise the hazardous air emission standards for the hazardous air pollutant major source categories (a) Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills and (b) Manufacturing of Nutritional Yeast;

(2)    The Court **DECLARES** that Defendant, in her official capacity as Administrator of the EPA, has failed to perform rulemakings and take mandatory action fulfilling her non-discretionary duties under 42 U.S.C. § 7412(f)(2) to promulgate either risk-based emission standards or a final determination that such standards are not required to protect public health and the environment for hazardous air pollutant major source categories (a) Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills and (b) Manufacturing of Nutritional Yeast;

(3)    The Court **ORDERS** Defendant, in her official capacity as Administrator of the

11

EPA, to review and either to revise the emission standards or issue a final determination that such revision is not necessary for (a) Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills and (b) Manufacturing of Nutritional Yeast by October 1, 2017, under 42 U.S.C. 7412(d)(6); and

(4)  The Court **ORDERS** Defendant, in her official capacity as Administrator of the EPA, to review and either to revise the emission standards or issue a final determination that such revision is not necessary for (a) Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills and (b) Manufacturing of Nutritional Yeast by October 1, 2017, under 42 U.S.C. § 7412(f)(2).

The Court retains jurisdiction to make such orders as may be necessary or appropriate. Plaintiffs may file any appropriate motion for attorneys' fees and costs within 30 days.

**IT IS SO ORDERED.**

Dated: 3/15/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge